UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **BRIAN T. BOYD,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No. 3:22-cv-00227** |
| ) | **Judge Aleta A. Trauger** |
| ) | |
| **JOSEPH MARTINEZ and TEK HOLDINGS** ) | |
| **GROUP, LLC,** ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| **CHRISTOPHER MARTINEZ, JOHN** ) | |
| **ALTERGOTT, RYZER SERVICES GROUP,** ) | |
| **LLC, 3-D TECHNOLOGY GROUP, LLC,** ) | |
| **and 3-D TECHNOLOGY, INC.,** ) | |
| ) | |
| Nominal Defendants. ) | |

## MEMORANDUM

Joseph Martinez and TEK Holdings Group, LLC ("TEK") have filed a Motion to Dismiss or, in the Alternative, to Stay Pursuant to the *Colorado River* Doctrine and Lack of Standing (Doc. No. 16), to which Brian Boyd has filed a Response (Doc. No. 21), and Joseph Martinez and TEK have filed a Reply (Doc. No. 28). Boyd has filed a Motion for Summary Judgment (Doc. No. 22), to which Joseph Martinez and TEK have filed a Response (Doc. No. 34), and Boyd has filed a Reply (Doc. No. 41). Finally, Joseph Martinez and TEK have filed a Motion for Summary Judgment (Doc. No. 38), to which Boyd has filed a Response (Doc. No. 43), and Joseph Martinez and TEK have filed a Reply (Doc. No. 45). For the reasons set out herein, the

court will deny the motion to dismiss or stay, grant each motion for summary judgment in part, and deny each motion for summary judgment in part.

## I. BACKGROUND

This lawsuit, which the court will refer to as the "Present Lawsuit," arises out of two earlier-filed lawsuits, which the court will refer to as the "Original Lawsuit" and the "Malpractice Lawsuit." In light of the complexity of the underlying facts, the court has created the following chart to indicate the roles of the parties in the respective matters:

|  | Original Plaintiffs | Original Defendants | Malpractice Plaintiffs | Malpractice Defendant | Present Plaintiff | Present Defendants | Present Nominal Defendants |
|---|---|---|---|---|---|---|---|
| 3-D Technology Group, LLC ("3-D") | X |  |  |  |  |  | X |
| TEK | X |  | X |  |  | X |  |
| Joseph Martinez | X |  | X |  |  | X |  |
| Ryzer Services Group, LLC |  | X |  |  |  |  | X |
| Christopher Martinez |  | X |  |  |  |  | X |
| Ryzer Services Group, LLC |  | X |  |  |  |  | X |
| John Altergott |  | X |  |  |  |  | X |
| 3-D Technology, Inc. |  | X |  |  |  |  | X |
| Brian T. Boyd |  |  |  | X | X |  |  |

2

The court will briefly recount the relevant details of each of the lawsuits, in an effort to explain how they led eventually to the currently pending motions.

### A. The Original Lawsuit

The Original Lawsuit, which began in 2018, was "corporate clean-up litigation" following the collapse of a joint business venture involving the individual Original Plaintiffs and Original Defendants working together through an entity, Original Plaintiff 3-D. (*See* Doc. No. 1-1 at 26–38 (Original Lawsuit ("OL") Verified First Amended Complaint ("VFAC").) Although Boyd was not a named party or attorney in the Original Lawsuit, the VFAC in that matter included some allegations regarding Boyd's involvement in the dispute between the parties:

> 28. [I]n April 2018, [the Original Defendants] caused attorney Brian Boyd, Esq. to send an undated letter to TEK and [Joseph] Martinez (the "April Boyd Letter"). . . . At the time Mr. Boyd was corporate counsel for 3D,[1] but also personally represented TEK in connection with 3D and had previously represented Joe Martinez personally.
>
> 29. In the April Boyd Letter, Defendants took several positions contrary to the Articles of Organization, Consent Action, and Operating Agreement . . . .
>
> 32. By a subsequent letter, Defendants caused 3D to purport to withdraw the April Boyd Letter, but they still dispute TEK's membership and initial capital contribution. . . .

(OL VFAC ¶¶ 28–29, 32.)

The Original Plaintiffs and Original Defendants eventually settled the underlying claims and executed a Confidential Settlement Agreement and Mutual Release ("Settlement Agreement"). (Doc. No. 11.) The Settlement Agreement identifies itself as "made by and between TEK Holdings, LLC and Joe Martinez (collectively 'TEK') on the one hand and 3-D Technology Group, LLC ('Company'), 3-D Technology, Inc. ('3-D'), John Altergott, Ryzer Technology Group, LLC ('Ryzer') and Chris Martinez (collectively '3-D Parties') on the other

---

[1] The various papers in the underlying cases use both "3D" and "3-D." For clarity, the court will use "3-D" when not quoting a source that uses "3D."

hand." (*Id.* at 1.) The Agreement states that the parties chose to "enter into this Agreement solely for the purpose of making peace and avoiding litigation." (*Id.* at 3.) A portion of the Recitals incorporated into the Agreement explains the situation as follows:

> [T]he Parties, without admitting liability or wrongdoing, desire to fully resolve all differences between them and have agreed to enter into this Agreement in full settlement and discharge of all damages, claims, demands, performance, or other action asserted or that could be asserted by either Party against the other in connection with any matters related to the Company.

(*Id.* at 1.) The capitalized "Party" is defined, in the Settlement Agreement, to refer to the signatories themselves. (*Id.*)

Boyd was not a signatory or named party to the Settlement Agreement. The actual Release, however, includes a long list of released entities and individuals, as well as a broad definition of the causes of action being released:

> Upon execution of and subject to the terms of this Agreement, except for the obligations created by this Agreement and the Related Agreements, the Parties, on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, divisions, companies under common control with any of the foregoing, affiliates and assigns, and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them, and each of them, *hereby release, remise and forever discharge* each other, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, divisions, companies under common control with any of the foregoing, affiliates and assigns and *their past, present and future* officers, directors, shareholders, interest holders, members, partners, *attorneys*, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them, and each of them, *from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, expenses (including attorneys' fees and costs actually incurred) and punitive damages, of any nature whatsoever* (collectively, "*Claims*"), *arising prior to the Effective Date of this Agreement, throughout the universe.*

(*Id.* at 2–3.) The Agreement states that it "shall inure to the benefit of and be binding upon the Parties as well as their successors and assigns, estates, beneficiaries, executors, heirs and personal representatives." (*Id.* at 5.)

The Settlement Agreement requires that, "[i]f any action is instituted to enforce, interpret or evade the terms of this Agreement, any such action shall be filed exclusively in a federal or state court located in Davidson County, Tennessee." (*Id.* at 5.) It also provides that, "[i]n the event any action is commenced to interpret or enforce the terms of this Agreement, the prevailing Party shall be entitled to an award of all costs and fees incurred, including reasonable attorneys' fees." (*Id.*) Although the attorney's fee provision uses the capitalized "Party" to refer to entities or individuals potentially entitled to recover such fees, the Agreement includes no such limitation on who is subject to the forum selection clause, which applies to "any action," with no mention of who filed the action or whom it was filed against. (*Id.*)

Finally, the provision regarding attorney's fees in the event of litigation to enforce the Settlement Agreement is accompanied by an arbitration requirement applicable to the "Parties":

> Notwithstanding the forgoing, prior to commencing any action, the Parties agree to first submit any dispute related to this matter to mediation to occur within 60 days demand by any Party, or as otherwise agreed. Any Party that fails to agree to and participate in mediation, expressly waives the right to the prevailing arty [sic] attorney fees provided for in this section and shall itself be liable to the counter-party for up to $10,000 in its attorney's fees and costs incurred as a result of such party's failure to participate, regardless of the outcome of litigation.

(*Id.*)

## B. The Malpractice Lawsuit

On January 15, 2019—that is, a few months before the settlement of the Original Lawsuit—the Malpractice Plaintiffs, who were also plaintiffs in that then-pending action, filed a Complaint against Boyd in Williamson County Circuit Court. (Doc. No. 1-1 at 11–24

5

Case 3:22-cv-00227   Document 46   Filed 10/20/22   Page 5 of 19 PageID #: 983

(Malpractice Lawsuit ("ML") Complaint).) The ML Complaint states claims for legal malpractice and breach of fiduciary duty related to the allegation that Boyd engaged in improper dual representation of, on one hand, Original/Malpractice Plaintiffs Joseph Martinez and TEK and, on the other, Original Defendants Christopher Martinez and Ryzer Services Group, LLC, during the formation of 3-D. (*Id.* ¶¶ 11–62.)

After the Original Lawsuit was settled, Boyd took no immediate steps to seek dismissal of the claims against him as precluded by the Agreement. Eventually, however, on May 24, 2021, he amended his Answer to add two new defenses, the latter of which was that the Settlement Agreement released him from any liability to TEK or Joseph Martinez. (Doc. No. 17-2 ¶ 74.) As of June 8, 2022, the Malpractice Lawsuit remained pending but was stayed, by agreement of the parties, pending mediation. (Doc. No. 44 ¶ 8; *see* Doc. No. 21-2.)

## C. The Present Lawsuit

On February 28, 2022, Boyd filed a Complaint for Declaratory Judgment and Attorneys' Fees against TEK and Joseph Martinez in Davidson County Circuit Court, with the various other parties named as nominal defendants. (Doc. No. 1-1 at 1–7 (Complaint).) Boyd seeks a declaration that all of the claims currently pending against him in the Malpractice Lawsuit are barred by the Settlement Agreement—in particular, the Settlement Agreement's broad release of "all known and unknown" claims against the signatories' "past, present and future . . . attorneys" that "ar[ose] prior to the Effective Date" of the Settlement Agreement. (Doc. No. 11 at 2–3.) He also seeks attorney's fees and costs pursuant to that Agreement. (Doc. No. 1-1 at 7.)

On April 1, 2022, Joseph Martinez and TEK removed the case to this court, based on the federal courts' jurisdiction over disputes between citizens of different states—in this instance, Florida citizens TEK and Joseph Martinez and Tennessee citizen Boyd. (Doc. No. 1.) *See*

6

*Mortenson Fam. Dental Ctr., Inc. v. Heartland Dental Care, Inc.*, 526 F. App'x 506, 508 (6th Cir. 2013) ("When determining whether diversity jurisdiction exists, a federal court must disregard nominal parties and decide jurisdiction only on the citizenship of the real parties in interest.") (citing *Certain Interested Underwriters at Lloyd's v. Layne*, 26 F.3d 39, 42 (6th Cir. 1994)).

On April 25, the defendants filed a Motion to Dismiss or, in the Alternative, to Stay. (Doc. No. 16.) The defendants pointed out that the sole issue on which Boyd sought declaratory relief (other than the secondary issue of attorney's fees) was one that had already been directly raised and was under consideration in state court as part of the Malpractice Lawsuit. The defendants argue that this court should therefore abstain from considering the matter, at least until the state court has had an opportunity to rule—at which point issues of preclusion would likely eliminate any need for this court to weigh in. The defendants rely on "*Colorado River* abstention," a doctrine named for *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).[2]

While that motion was pending, the parties filed respective Motions for Summary Judgment focused on the merits of Boyd's claim. (Doc. Nos. 22, 38.) The defendants, however, state in their briefing that, "[i]n moving for summary judgment here, the Defendants do not waive their position that, in fact, Mr. Boyd's latest litigation should first be dismissed based upon

---

[2] The motion also advances an alternative argument about "standing," but that argument is without merit. There is no plausible argument that Boyd could possibly lack standing to assert *his own* purported right to a release of claims. The defendants, of course, suggest that he has no such right, but "standing in no way depends on the merits of the plaintiff's" claims. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). What the defendants are referring to as "standing" is, rather, an argument on the merits regarding whether the Settlement Agreement granted Boyd an enforceable release. *See In re Cap. Contracting Co.*, 924 F.3d 890, 894 (6th Cir. 2019) (explaining that so-called "prudential standing" doctrines present merits questions). The issue of whether Boyd has a right to a release is wholly encompassed by the later-filed motions for summary judgment.

7

impermissible forum shopping in violation of *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)," or, "[i]]n the alternative, this case should be stayed pending resolution of the state proceeding." (Doc. No. 39 at 1–2.) The defendants ask the court to reach the merits of the dispute only "if [the abstention motion] is denied." (*Id.* at 2.)

## II. LEGAL STANDARD

### A. *Colorado River* Abstention

"Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .'" *Colo. River*, 424 U.S. at 817 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)). This rule "stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* (citations omitted). Nonetheless, as the Supreme Court recognized in *Colorado River*, circumstances do exist permitting the dismissal of a federal suit "due to the presence of a concurrent state proceeding." *Id.* at 818. However, "[o]nly the clearest of justifications will warrant" abstention from the exercise of jurisdiction by the district court. *Id.* at 819.

"Before the *Colorado River* doctrine can be applied, the district court must first determine that the concurrent state and federal actions are actually parallel." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (citing *Crawley v. Hamilton Cnty. Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984)). Assuming that threshold question is answered affirmatively, the court must then consider and weigh a number of factors to determine whether abstention is warranted, including: (1) whether the state court has assumed jurisdiction over any *res* or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether the source of

8

Case 3:22-cv-00227   Document 46   Filed 10/20/22   Page 8 of 19 PageID #: 986

governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction. *Id.* at 340–41 (citations omitted).

**B. Summary Judgment**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of his claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of

fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

#### A. Abstention

The Sixth Circuit caselaw defining parallelism of cases for the purposes of *Colorado River* contains a certain amount of tension. On one hand, most cases stating the general rule for abstention under *Colorado River* require the parallelism of the state case to the federal case to be fully comprehensive of the federal case's substantive issues. Pursuant to these cases, "[i]f a state court action and a federal action are truly parallel, resolution of the state court action will also resolve all issues in the federal action." *Wright v. Linebarger Googan Blair & Sampson, LLP*, 782 F. Supp. 2d 593, 603 (W.D. Tenn. 2011) (citing *Baskin v. Bath Twp. Bd. of Zoning Appeals*, 15 F.3d 569, 572 (6th Cir. 1994)). Accordingly, "[c]ases are not considered parallel if there is an issue that would not be resolved by the state court upon the completion of the state court action." *Walker v. Cedar Fair, L.P.*, No. 3:20cv2176, 520 F. Supp. 3d 925, 930 (N.D. Ohio 2021) (quoting *Kopacz v. Hopkinsville Surface & Storm Water Util.*, 714 F. Supp. 2d 682, 688 (W.D. Ky. 2010)). This strict standard is bolstered by the admonition by the Supreme Court that, insofar as ambiguity remains about the adequacy of the state court litigation to resolve all of the issues, that ambiguity should be resolved against abstention:

> When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all.

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983).

On the other hand, however, the caselaw of this Circuit has, at times, expressly warned courts and parties not to require too precise a similarity between the state and federal litigation at

issue in order to find the cases parallel. In particular, the defendants rely on the Sixth Circuit's statement in *Romine v. Compuserve Corp.* that "[e]xact parallelism is not required" to support *Colorado River* abstention, as long as the "two proceedings are substantially similar." *Romine*, 160 F.3d at 340 (quoting *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989)). Although that statement was made some time ago, Boyd has not identified any intervening caselaw abrogating or superseding it, and the Sixth Circuit has recently reiterated the principles set forth in *Romine*, albeit in an unpublished case. *See Healthcare Co. Ltd. v. Upward Mobility, Inc.*, 784 F. App'x 390, 394 (6th Cir. 2019). The "substantial similarity" standard set forth in *Romine* is therefore good law. That good law, though, is not defined in much detail, and it is not clear, from the text of the opinion itself, whether the *Romine* formulation is intended to state a general test for parallelism—in which case it would be hard to square *Romine* with the rest of the relevant caselaw—or rather merely to explain how certain particular alleged defects that happened to be present in *Romine* could be overcome. The standard for exactly how parallel two pieces of litigation must be in order to support abstention in the Sixth Circuit therefore remains somewhat murky, at least at the margins.

If Boyd had only sought a declaration of his rights, such a case may well have been parallel, even under the most demanding version of the parallelism test. The question of whether Boyd is entitled to protection from the release included in the Settlement Agreement is wholly encompassed by his pleaded defense to the malpractice claims against him, meaning that there should be no need for such a declaration if he prevails on that defense. Boyd, however, also seeks payment of attorney's fees and expenses related to that litigation. That claim, moreover, could not have been asserted as a counterclaim in the Malpractice Lawsuit because any claim to enforce a right under the Settlement Agreement must, by the terms of the Agreement itself, be

11

filed in Davidson County.³ The defendants have not identified any persuasive basis for concluding that the Malpractice Lawsuit, in its current form, will necessarily resolve the issue of Boyd's entitlement to fees and costs.⁴ The fact that this court could stay this litigation, wait for the Malpractice Lawsuit to reach total conclusion, and still have work to do weighs strongly against a finding that the matters are wholly parallel.

Although *Romine* counsels some flexibility in this otherwise demanding inquiry, it is not clear to the court that that flexibility is sufficient to support a finding of parallel litigation here. *Romine* involved "[f]our duplicative class action cases . . . arising out of the same securities transaction" brought by plaintiffs "represented by the same counsel," who "apparently want[ed] all the duplicative actions to go forward in all of the courts at the same time." *Romine*, 160 F.3d at 338. The Sixth Circuit based its holding, at least in part, on its conclusion that the caselaw permitting a finding of parallel litigation despite some incongruity between the underlying lawsuits was "especially apposite" in the context of overlapping putative class actions. *Id.* at 340. The Malpractice Lawsuit and the Present Lawsuit, in contrast, are not putative class actions and

---

³ The defendants suggest that Boyd has waived any reliance on the forum selection provision by pleading an affirmative defense based on the release in the Malpractice Litigation. The forum selection clause, however, applies only to an "action . . . instituted to enforce, interpret or evade the terms of" the Settlement Agreement. It is ambiguous whether the word "action" includes the assertion of an affirmative defense—if not outright clear that it does not. In any event, there is no principle that required Boyd to sabotage his own defense in the Malpractice Lawsuit in order to retain his right to file a separate declaratory judgment action consistent with the forum selection clause.

⁴ The defendants suggest that, if Boyd succeeds in his defense in the Malpractice Lawsuit, he will be able to recover fees and costs as well, because Tennessee law does not require specific pleading of a request for attorney's fees. (Doc. No. 32 at 3–4.) The only source of law that the defendants cite for that proposition, however, states simply that a *plaintiff* who has pleaded a successful claim is not required to have specifically pleaded attorney's fees *as a type of damages available in connection with that claim*, because the plaintiff can be reasonably assumed to have been "seeking all relief authorized" by the relevant cause of action. *See Killingsworth v. Ted Russell Ford, Inc.*, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002). Boyd, however, has not pleaded a claim in the Malpractice Lawsuit at all—merely a defense. He does not seek any relief in that litigation—simply for the litigation to end without his losing. The case identified is therefore inapposite. It may still be possible that the Tennessee court would nevertheless award attorney's fees to Boyd as a defendant, but that is merely conjecture, without the degree of confidence required by *Colorado River*.

12

Case 3:22-cv-00227   Document 46   Filed 10/20/22   Page 12 of 19 PageID #: 990

are not so much duplicative as they are at cross-purposes: each case seeks to vindicate a position incompatible with the position espoused by the other. In this instance, moreover, the parties seeking to rely on *Colorado River* agreed to a forum selection clause that, by no fault of the party opposing abstention, potentially necessitated piecemeal litigation under fact patterns such as this one. Indeed, when the defendants agreed to that forum selection clause, the Malpractice Lawsuit was already pending in a judicial district in which Boyd's claims could not have been brought. The concerns about strategically duplicative litigation unilaterally orchestrated by one side of a dispute that seem to have animated the Sixth Circuit's analysis in *Romine* are therefore absent here.

*Romine*, moreover, involved abstaining from considering a federal action in favor of a "more comprehensive" state action. *Romine*, 160 F.3d at 340. This court relied on that distinction, among other things, in applying *Romine* in *Iron Workers of W. Pennsylvania Pension Plan v. Caremark RX, Inc.*, No. 3:06-1097, 2007 WL 60927, at *4 (M.D. Tenn. Jan. 5, 2007) (Trauger, J.), another putative class action case on which the defendants seek to rely. Such an approach is consistent with the Supreme Court's instruction to focus on whether the relevant "state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28. As the court has already discussed, however, the defendants have not established that the Malpractice Lawsuit will, in fact, resolve all issues between the parties, including Boyd's potential entitlement to attorney's fees.

Of course, none of the differences between this case and *Romine* necessarily rules out the possibility that this case might also be one in which abstention is appropriate. The caselaw makes clear, however, that, if the court is in doubt about the parallelism of the underlying litigation, it

13

should resolve that doubt in favor of fulfilling its "virtually unflagging obligation . . . to exercise the jurisdiction" it has been granted by Congress under the Constitution. *Colorado River*, 424 U.S. at 817; *see Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28. Although cases such as *Romine* have found occasions for departing from that obligation based on the particulars of individual situations, the prevailing view among courts continues to be that "[t]he teaching of the *Colorado River* case was that only 'exceptional' circumstances will permit a federal court to refrain from exercising its jurisdiction for reasons of wise judicial administration due to the presence of a concurrent state proceeding." 17A Fed. Prac. & Proc. Juris. § 4247; *see also Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) ("Abstention is 'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'") (quoting *Colo. River*, 424 U.S. at 813).

This case is not an extraordinary one; it is, rather, an ordinary instance of a bundle of disagreements that could have been resolved in a single court, but for a forum selection clause splitting the underlying claims up. That voluntary dividing up of claims, in this instance, happened to involve some of the claims remaining in state court, while others were removed to federal court. Such a pattern may be inefficient, but it is not improper, and the caselaw does not clearly support abstention in such a situation—at least as long as the federal case includes some meaningful substantive questions that may not be adequately resolved by the state case, as this one does. The court accordingly will not abstain.[5]

---

[5] For the same reasons, the defendants are not entitled to dismissal or summary judgment based on the doctrine disfavoring "claim-splitting." *See Waad v. Farmers Ins. Exch.*, 762 F. App'x 256, 259 (6th Cir. 2019). The caselaw regarding claim-splitting, to the extent it is even applicable here, focuses on whether claims could and should have been brought together and whether the resolution of one lawsuit would resolve all issues raised by the other—that is, the same factors that support Boyd's position under *Colorado River. See id.* Moreover, to the extent that any claims have been split, it was the defendants who split them, by bringing their malpractice claims in one state judicial district and then executing a Settlement Agreement bearing on related subject matter with a forum selection clause requiring litigation

14

### B. Merits

"[S]ettlement agreements made during or in contemplation of litigation are enforceable as contracts." *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006) (citations omitted). Under Tennessee law, interpretation of a written contract is generally a matter of law, not fact. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). The court's undertaking is to determine the manifested intention of the parties at the time of execution. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). To do so, courts are bound by contract terms as written and should interpret terms in accordance with their "natural and ordinary meaning, . . . avoid[ing] strained constructions that create ambiguities where none exist." *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999) (internal citations omitted).

The natural and ordinary meaning of the Settlement Agreement is that Boyd, as a "past . . . attorney" of parties to the Agreement, is released from any claims by the Malpractice Plaintiffs related to the defunct 3-D business venture, as long as those claims "ar[ose] prior to the Effective Date of th[e] Agreement." (Doc. No. 11 at 2–3.) Indeed, the release, read literally, is even broader than that—seeming to release covered individuals from a virtually unlimited array of theoretically possible claims, even those wholly unrelated to the business disputes that gave rise to the Original Lawsuit. The contract, read as a whole, may limit that scope somewhat, to exclude claims that are wholly unrelated to the parties' failed business venture. The claims asserted against Boyd, however, are not unrelated to that subject matter, but rather closely related to it. Indeed, facts related to Boyd's allegedly improper dual representation were expressly discussed in the VFAC in the Original Lawsuit. (OL VFAC ¶¶ 28–29, 32.)

---

in a second state judicial district. *Cf. Davis v. Sun Oil Co.*, 148 F.3d 606, 613 (6th Cir. 1998) (holding that the claim-splitting doctrine is unavailable where "the parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein") (citation omitted).

The defendants nevertheless argue that Boyd is not entitled to protection by the Settlement Agreement because he was not an intended third-party beneficiary thereof. To qualify as a third-party beneficiary under Tennessee law, a plaintiff must show that:

(1) The parties to the contract have not otherwise agreed;

(2) Recognition of a right to performance in the [third party] is appropriate to effectuate the intention of the parties; and

(3) The terms of the contract or the circumstances surrounding performance indicate that either:

>(a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or

>(b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016); (quoting *Owner-Operator Indep. Drivers Ass'n v. Concord EFS, Inc.*, 59 S.W.3d 63, 70 (Tenn. 2001)). The court sees no plausible reading of the Settlement Agreement that would fail that test. The agreement does not disclaim that it grants rights to third parties. At most, it states that it "shall inure to the benefit of and be binding upon the Parties" and their successors, but that general statement cannot be read to supersede the specific grant of rights to all of the non-signatories included in the release. *See Mark VII Transp. Co. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 648 (Tenn. Ct. App. 2009) ("When a contract contains both general and specific provisions relating to the same thing, the specific provisions control. Where uncertainty exists between general and specific provisions, the specific provisions will usually qualify the general.") (citing *Cocke Cnty. Bd. v. Newport Utilities Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)). The Agreement is unmistakably explicit in its intent to grant a release to a broad array of third-party individuals and entities—including, specifically, attorneys. Such a broad release is, moreover, consistent with the

parties' stated shared intent to close the book on their failed business venture without more litigation. An ongoing lawsuit about dual representation connected to 3-D is directly contrary to that purpose and could, among other things, result in discovery and evidentiary obligations by signatories other than merely TEK and Joseph Martinez.

The defendants protest that the Settlement Agreement's broad release language is merely "generic" and should not be read to release claims other than those contemplated in the Original Lawsuit. Under Tennessee law, however, "the literal meaning of the language," if "clear and unambiguous, . . . controls the outcome of contract disputes." *Planters Gin Co.*, 78 S.W.3d at 890. There is no special exception for when a party to an agreement claims, in hindsight, that language was merely included by default and was not intended to mean what it plainly says.

The contention that the language of the release is so "generic" as to be effectively meaningless is, moreover, unpersuasive. There is no requirement that an agreement settling legal claims between a few identified signatories include a release that, by its express terms, applies to a paragraph-length list of third parties. The inclusion of a broad third-party release was a choice—one apparently made in support of the Settlement Agreement's express purpose of putting the matter of the parties' failed business venture to bed without any more legal wrangling. Boyd's assertion of the release now is not some incidental, unforeseeable side effect. It is the release doing exactly what it says it does, to the exact end that the Agreement identifies as the signatories' shared goal. Maybe it did not occur to the defendants that their rights to sue Boyd for malpractice were among the rights they were releasing, but that subjective lack of foresight does not change the fact that those rights were, by any reasonable reading of the Settlement Agreement, released. *See In re Est. of Diviney*, No. M2017-00739-COA-R3-CV, 2017 WL 5712904, at *5 (Tenn. Ct. App. Nov. 28, 2017) ("Where [a] contract is unambiguous,

17

unless there is 'proof of fraud, misrepresentation, undue influence [or] situations of like character, the unspoken subjective intent of a party is not relevant.'") (quoting *Malone & Hyde Food Servs. v. Parson*, 642 S.W.2d 157, 159 (Tenn. Ct. App. 1982)).

Finally, the defendants argue that, even if the court is inclined to accept Boyd's reading of the language of the release, the court should nevertheless refrain from granting summary judgment, in order to permit the defendants to engage in further discovery and present additional evidence on the matter. Tennessee law is clear, however, that the consideration of such extraneous evidence is only an appropriate tool of interpretation "when a contractual provision is ambiguous." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). There is no ambiguity in the language of the release, at least in terms of whether it applies to claims by the defendants against Boyd based on his work as an attorney in matters related to the 3-D venture. The defendants, moreover, "do not maintain [that] the . . . release was wrongfully obtained" (Doc. No. 36 ¶ 4), so there is no alternative basis for seeking outside evidence, aside from as a tool for supposedly clarifying language that is, in fact, already crystal-clear. Boyd is therefore entitled to a declaration that any malpractice claims against him by the defendants related to the business venture at issue in the Original Lawsuit are within the scope of the release included in the Settlement Agreement.

That does not, however, necessarily mean that Boyd is entitled to attorney's fees. The Settlement Agreement's attorney's fees provision—like its arbitration provision—applies to capital-P "Parties," a term that is expressly defined in the Agreement.[6] The definition of "Party"

---

[6] Admittedly, the defendants do not frame their argument regarding attorney's fees in this manner. They do, however, broadly argue that Boyd is not entitled to attorney's fees under the Settlement Agreement, which the court construes as sufficient to preserve the issue for consideration by the court in light of the plain language of the contract.

18

is far narrower than the broad list of individuals entitled to a release and is confined only to the actual, named parties to the Agreement. On one hand, this fact benefits Boyd, because it means he was able to seek declaratory relief without submitting to arbitration first.[7] On the other hand, however, just as the plain language of the contract *does* grant him a release, despite his not being a "Party," it *does not* grant him, as a non-Party, a right to attorney's fees. The court accordingly will grant the defendants summary judgment as to that aspect of his claims.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss or, in the Alternative, to Stay Pursuant to the *Colorado River* Doctrine and Lack of Standing (Doc. No. 16) will be denied, the defendants' Motion for Summary Judgment (Doc. No. 38) will be granted in part and denied in part, and Boyd's Motion for Summary Judgment (Doc. No. 22) will be granted in part and denied in part. The court will grant Boyd summary judgment as to his claim for declaratory judgment and will grant the defendants summary judgment as to his claim for attorney's fees and costs.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[7] "[N]onsignatories may be bound to an arbitration agreement under ordinary contract and agency principles." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003). For that to occur, however, the arbitration provision must actually apply, by its own terms, to that non-signatory. The use of "Party" in the arbitration provision, combined with the definition of "Party" in the Agreement, limits the provision to signatories according to its plain language.